## COMMONWEALTH *vs.* ANTHONY D. WILLIAMS.

Bristol. September 11, 2009. - January 8, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, BOTSFORD, & GANTS, JJ.

*Deoxyribonucleic Acid. Evidence,* Exculpatory, Scientific test, Relevancy and materiality, Expert opinion. *Practice, Criminal,* Preservation of evidence, Loss of evidence by prosecution, Capital case. *Due Process of Law,* Loss of evidence by prosecution. *Homicide.*

This court concluded that where a defendant claims that the Commonwealth has lost or destroyed potentially exculpatory evidence, the defendant bears the initial burden of demonstrating the exculpatory nature of the evidence by showing that there is a reasonable possibility, based on concrete evidence, that access to what was lost would have produced evidence favorable to the defendant's case; and if the burden is met, the judge or reviewing court must balance the Commonwealth's culpability, the materiality of the evidence, and the prejudice in order to determine whether the defendant is entitled to relief [713-718]; further, this court concluded that where the Commonwealth has acted in bad faith or recklessly in causing the loss or destruction of evidence, a defendant may be independently entitled to a remedy without having met the initial burden [718-719].

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress evidence of certain deoxyribonucleic acid (DNA) test results, where the defendant failed to establish a reasonable and evidence-based possibility that the opportunity, which was lost, to have his expert observe a private laboratory conduct DNA testing for the Commonwealth of blood samples that were of such limited size that a single DNA analysis would consume them in their entirety, was exculpatory (i.e., that it would have produced evidence favorable to his cause), given that the defendant did not submit an affidavit or testimony from his expert to explain the nature of what was lost by the expert's inability to observe the testing. [719-721]

This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a verdict of felony-murder in the first degree or to order a new trial, where the defendant was not prejudiced by his expert's inability to observe a private laboratory conduct deoxyribonucleic acid (DNA) testing for the Commonwealth, in that counsel for the defendant ably cross-examined the Commonwealth's expert as to the chaos in the private laboratory and the effect of that chaos on sample processing, as well as bringing the private laboratory's past processing errors to the attention of the jury; and in that the judge instructed the jury concerning inferences that they could draw from the Commonwealth's handling of the matter. [721]

INDICTMENT found and returned in the Superior Court Department on June 30, 2004.

A pretrial motion to suppress evidence was heard by *Richard T. Moses*, J., and the case was tried before *E. Susan Garsh*, J.

*Leslie W. O'Brien* for the defendant.

*M. Catherine Huddleson*, Special Assistant District Attorney, for the Commonwealth.

Botsford, J. Following a jury trial in the Superior Court, the defendant was convicted of felony-murder in the first degree of Scott Michael Kelly.[1] In this direct appeal from his convictions, the defendant argues error in the denial of his motion to suppress evidence of certain deoxyribonucleic acid (DNA) test results because the testing, which exhausted the only DNA samples available, was conducted when the defendant's expert was absent. We conclude that the motion to suppress was properly denied. Based on our review of the entire case, we decline to exercise our authority under G. L. c. 278, § 33E, to grant the defendant a new trial or other relief.

1. *Background.* a. *The trial.* From the evidence the jury could have found the following. In the early morning hours of March, 10, 2004, the defendant was in the company of Gilbert Wilding and three others at Wilding's home in Berkley. The group was drinking beer and consuming cocaine after having been drinking in Taunton. Around 7:30 A.M. the defendant dialed the cellular telephone of the victim, Scott Michael Kelly, who was a person known to deal drugs. At the conclusion of the call, and in apparent reference to obtaining cocaine from the victim, the defendant informed Wilding that if the latter could procure a ride, "his boy would hook him up." Wilding then telephoned his brother, David Lawson, who arrived at the Wilding residence shortly thereafter in his car — a black Ford Taurus automobile with American flags attached to each of the rear passenger windows. The defendant sat in the front passenger seat, Wilding in the back seat, and Lawson drove. The trio proceeded to Taunton, with the defendant directing Lawson to 60 Broadway Street in Taunton, the address of the apartment building where the victim lived.

When the group arrived at their destination, the defendant got out of Lawson's car, walked along the driveway to the side of

---

[1]The underlying felony found by the jury was armed robbery. The defendant was also convicted of assault and battery by means of a dangerous weapon.

the building, and was out of sight for only two to three minutes. He then returned to the car, spoke briefly with Wilding, and went back to the apartment building for an additional two to three minutes. The tenant in the second-floor apartment, who was herself leaving the building, saw the defendant leave the building by the side porch and go around to the building's front. He was a heavy-set black male who had on a flannel "overshirt that construction workers wear."[2] The defendant returned to Lawson's car, got into the front passenger seat, and said, "We're all set. Let's go." The car then drove away. The defendant was at 60 Broadway Street for no more than ten minutes; he, and the Lawson vehicle, departed shortly before 9:20 A.M.

The victim was stabbed while in the basement of the apartment building at 60 Broadway Street. He climbed up the stairs to the first floor where he kicked the door of the first-floor apartment in an attempt to get help. The tenant living in that apartment, Tonya Ferguson, and Paul Barros, a friend of the victim who had been in the victim's apartment on the third floor until he heard the door banging and Ferguson's scream from the first floor, ultimately located a cellular telephone and dialed 911. However, the victim died on the stairs between the first and second floors. The telephone call to 911 was placed

---

[2]The second-floor tenant, Donna Hutchings, identified the defendant at trial as the one who left the building. On two occasions shortly after the murder, Hutchings identified two different people from two different photographic arrays. In the first array, which did not include a photograph of the defendant, she selected another man and said she was "ninety percent" sure that he was the man she had seen; in the second array, which had the defendant's photograph included, she chose a different man and said he looked more like the man she had seen than the first man she had selected. She described to the police the man she saw as wearing a flannel checked jacket and having "two really large · rolls at the back of his neck and that's how she could identify him, more prominently than a front view." At trial, she identified the defendant as the man who had left the building. Kevin Ashley, who was standing less than two blocks away from the victim's apartment building, witnessed a dark car with two American flags sticking out the windows pull up to the victim's building and a large black male wearing a black and white checkered "coat" get out and go into the building. Shortly after the murder, Ashley identified the defendant from one of the same photographic arrays shown to Hutchings as "maybe" the man who had gotten out of the car. At trial, Ashley testified that the defendant resembled the man he saw get out of the car, and that the jacket the man was wearing looked like the checkered jacket or shirt the defendant was holding when arrested.

between 9:18 A.M. and 9:20 A.M., shortly before police officers arrived.

On the same day as the killing, March 10, the police obtained the records of the victim's cellular telephone, which led them to the Wilding residence in Berkley. They were allowed in by Donna Wilding and after looking around the house, found the door to a cellar; they called down for anyone there to come up, but no one responded. They proceeded down to the cellar where they found the defendant. When found, he had in his possession a piece of paper with the victim's telephone number on it. He was also holding a checkered flannel shirt or jacket.

The victim died of a single stab wound to his chest, and there was considerable blood at the scene of the killing. During the ensuing investigation of the case, State police forensic chemists collected a number of blood samples, eight of which were the subject of the defendant's motion to suppress. Two of these eight came from the checkered jacket or shirt that the defendant was holding when he was arrested, one came from the defendant's left hand, two from his right hand, and three from the passenger area of Lawson's automobile (one each from the exterior door handle, interior door panel, and interior door pull). All of the blood samples were sent to the State police crime laboratory (crime laboratory) for DNA testing and analysis in the weeks after the incident.

The results of the DNA analysis were mixed. The blood sample from the defendant's left hand contained a mixture of DNA of at least three individuals, at least one of whom was an unknown male; the victim, however, was excluded as a possible contributor to the sample. The blood sample from the defendant's right hand webbing contained a DNA mixture of two individuals, at least one of whom was an unknown male, but again the victim was excluded as a possible contributor. The other sample from the defendant's right hand contained an insufficient amount of DNA to produce any conclusive results, as did one of the samples from the defendant's checkered jacket or shirt. The second sample taken from this garment originated from at least one male, and the victim could not be excluded as a possible source of that sample. In two of the samples from Lawson's automobile — one from the exterior door handle and one from the interior

door panel — the victim was identified as the primary DNA source. The final sample, taken from the interior door pull, originated from at least one male, but no conclusions could be drawn as to whether the victim was the source.

b. *DNA testing*. At some point after the defendant was indicted in this case, the crime laboratory reported to the prosecutor that each of the blood samples just described was of such limited size that a single DNA analysis would consume it in its entirety. On learning this fact, the prosecutor notified the defendant's counsel, who indicated that he would secure his own expert to observe the testing at the State crime laboratory. Arrangements to this effect were completed in October, 2004, and the defendant's counsel signed an "exhaustive DNA testing authorization" form on which he checked the box notifying the prosecutor that the defendant requested to have his expert present at the testing. In November, 2004, the crime laboratory notified the prosecutor that there was a backlog of six to eight months before the case would be assigned to a chemist for DNA testing, and that, once assigned, it would take an additional six to eight weeks to complete the tests. Based on this timetable, the parties anticipated being able to select a trial date by the following spring. By April, 2005, however, because of the backlog, the samples still had not been assigned to a chemist for analysis. In order to schedule a trial date, the parties agreed that the Commonwealth would send the samples to a private laboratory with instructions for expedited testing. The samples were sent to Orchid Cellmark (Cellmark) in Germantown, Maryland, in June, 2005. A rush order request as well as a request to have the defendant's expert present during the DNA testing were contained in the transmittal letter from the Massachusetts State police to Cellmark's Germantown laboratory.

At some point, the parties chose July 25, 2005, as the trial date. During June and July, 2005, the prosecutor monitored the progress of the Cellmark testing, but was informed on July 6 that the defense expert, John Abbott, could not be present to observe the analysis until July 19. As a result, Cellmark could not complete the testing in time for the previously selected July 25 trial date. The parties then jointly moved to continue the trial from July 25 to August 29, 2005.

Unknown to either the prosecution or defense at the time, Orchid Cellmark was in the process of closing the Germantown laboratory and transferring all cases to its laboratory in Dallas, Texas. These events caused further postponements of the trial date. The blood samples were received in Cellmark's Dallas facility on August 31, 2005. At the same time, Cellmark was in the process of implementing new processing procedures at that laboratory which, when combined with the "tremendous increase in casework" resulting in part from the closure of the Germantown laboratory, created a breakdown of communication between and among Cellmark analyst teams. As a result of such breakdowns, the rush order that had originally accompanied the blood samples to Cellmark's Germantown laboratory was honored, but the request to have the defendant's expert present was not. Abbott contacted the Dallas laboratory on September 26, 2005, after the DNA analysis was already in progress.[3] Cellmark completed the entire DNA analysis without Abbott's being present. Cellmark issued its report on the DNA analysis results on September 30, 2005.

After receiving a copy of the Cellmark test results, the defendant filed a motion to suppress the DNA evidence, based on the loss or destruction of potentially exculpatory evidence by the Commonwealth "and/or its agent Orchid Cellmark." The motion was heard on October 24, 2005, and May 12, 2006.[4] At the October 24 hearing, the Commonwealth submitted the entire DNA case file from Cellmark, including all the test records and results. Defense counsel acknowledged that only a single test could be performed on the samples, but argued that the purpose of having his expert present at Cellmark was "[t]o determine whether or not they do perform valid tests . . . according to national [*sic*] recognized procedure and protocols." The motion judge stated his view that the reliability of the DNA test results, and the details of the protocols and procedures that produced them, were the province of expert opinion. To that end, the

---

[3]There is evidence that Abbott failed to leave his own contact information when he telephoned Cellmark's Dallas laboratory on September 26, 2005. It is not clear what difference the contact information would have made, because the DNA testing was already underway.

[4]The reason for the seven-month interval between the two hearing dates is not disclosed in the record.

judge requested the Commonwealth to provide, in an affidavit from a Cellmark official, the details of the testing protocol and any variations therefrom during the tests of the specific samples in question. Defense counsel was then to provide these affidavits and the Cellmark file materials to his expert, who would be afforded an opportunity to respond with counter affidavits.

Before the May 12, 2006, hearing, the Commonwealth obtained three affidavits from Judith Floyd, the manager of the Cellmark forensic laboratory in Dallas. These affidavits set out the credentials of Floyd herself as well as the accreditation process and regulatory oversight to which Cellmark's DNA laboratory and testing protocols are subject. Floyd stated in two of the affidavits that the test methods used in this case were standard for the industry and have been subject to repeated scrutiny by these accrediting and oversight bodies. In regard to this specific case, Floyd stated that there was no departure from standard testing protocols and that this fact had been verified by Cellmark's reviewing analysts. Floyd's second and third affidavits also discussed internal organizational problems and breakdown of communications that Cellmark's Dallas laboratory was experiencing during September, 2005, the month that the blood samples in this case were tested. The affidavits further described the circumstances that purportedly led to Cellmark's failure to secure the defense expert's presence for the DNA testing. These affidavits did not state that the organizational and communications problems led to any irregularities in the DNA testing procedures or analysis themselves. While the defense received the Floyd affidavits and appears to have provided them to Abbott for review, Abbott did not submit any responding affidavit at the May 12 hearing date, nor did he testify. Defense counsel's position was that Cellmark's experts "could say anything" as to the validity of their procedures in this specific case, and any analysis by Abbott would be mere after-the-fact speculation as to what may have happened and how it could have affected the results.

In denying the motion to suppress, the judge concluded that the defendant had failed to meet what the judge described as the defendant's initial burden of showing a reasonable and concrete possibility that access to the exhaustive analysis of the blood samples would have produced evidence favorable to his cause.

The judge rested this ruling on the fact that the defendant had presented "no evidence . . . that the protocol followed by Cellmark in connection with the DNA analysis was in any way faulty." He further stated that, in all likelihood, the presence of the defendant's expert would have actually bolstered the reliability of Cellmark's test results and that the Floyd affidavits provided ample opportunity for cross-examination concerning the confusion at Cellmark around the time the analysis was done.

2. *Discussion.* The defendant argues that the judge applied an incorrect legal standard in denying his motion to suppress. Specifically, he claims that the judge erred by reviewing the question whether the allegedly "lost" evidence — the opportunity of defense counsel to witness the DNA testing[5] — was exculpatory according to a standard that did not take into account the fact that he had made a specific request to be present at the DNA testing. In his view, the proper standard in the case of a specific request for the lost or destroyed evidence is for the judge to determine whether the defendant has shown a "reasonable possibility" that the lost evidence was exculpatory, which means, the defendant contends, whether the lost evidence might have affected the verdict. See *Commonwealth* v. *White*, 47 Mass. App. Ct. 430, 433 (1999), on which the defendant relies. The defendant asserts he clearly showed that the lost opportunity to view the DNA testing was exculpatory under this standard, because the evidence suggesting chaotic confusion at Cellmark's Dallas laboratory created a reasonable possibility that had the defense expert been present at the DNA testing as requested, he would have witnessed evidence revealing that the Cellmark DNA "analyst, in the midst of this rush and confusion, was inattentive in other aspects (beyond the careless reviewing of instructions provided with the file) relating to the testing as well." Accordingly, the argument goes, the judge should have proceeded to weigh or balance the Commonwealth's culpability, the materiality of the lost evidence, and the prejudice to the defendant — the

---

[5]It should be noted that, while the defendant's motion to suppress seeks relief for "the Commonwealth's . . . loss (and/or destruction) of evidence preventing the defendant from testing the samples," the issue argued during the motion hearing and advanced on appeal was the lost opportunity to witness the testing that was carried out.

result of which should have led to the conclusion that the defendant was entitled to the remedy sought, namely, suppression of all DNA evidence.

The defendant's argument seems to conflate what must be shown to demonstrate that lost or destroyed evidence is "exculpatory," and what is necessary to show the "materiality" of that evidence to the case. These are two separate issues. We begin with consideration of the first.

As a requirement of due process, the Commonwealth has a duty to disclose to a defendant material, exculpatory evidence in its possession or control. See *United States* v. *Agurs*, 427 U.S. 97, 106 (1976) (*Agurs*); *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963) (*Brady*); *Commonwealth* v. *Tucceri*, 412 Mass. 401, 404-405 (1992); *Commonwealth* v. *Ellison*, 376 Mass. 1, 21 (1978) ("suppression by the prosecution of requested material evidence which is favorable to the accused is a denial of due process"). Where the defendant claims that the Commonwealth has withheld or not disclosed still-existing exculpatory evidence, "the defendant must first prove that the evidence was, in fact, exculpatory."[6] *Commonwealth* v. *Healy*, 438 Mass. 672, 679 (2003). As the court has recognized, however, where the Commonwealth loses or destroys — as opposed to withholds — evidence claimed to be exculpatory, the situation presents particular concerns. In *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984) (*Neal*), we noted the difficulty facing a defendant in these circumstances, because "it is no longer possible to determine whether the defendant would have obtained any evidence of an exculpatory nature had [the evidence being sought] been made available to him for inspection or examination." We stated:

"To require the defendant at this stage to prove that the [lost or destroyed evidence at issue] [was] in fact exculpa-

---

[6] " '[E]xculpatory' is not a technical term meaning alibi or other complete proof of innocence, but simply imports evidence 'which tends to negate the guilt of the accused . . . or, stated affirmatively, supporting the innocence of the defendant.' " *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 n.9 (1978), quoting *Commonwealth* v. *Pisa*, 372 Mass. 590, 595 (1977). Accord *Commonwealth* v. *Healy*, 438 Mass. 672, 679 (2003). "[E]vidence tending to impeach the credibility of a key prosecution witness is 'clearly exculpatory.' " *Commonwealth* v. *Neal*, 392 Mass. 1, 11 (1984) (*Neal*), quoting *Commonwealth* v. *Collins*, 1, 8 (1982).

tory would . . . convert the disclosure duty established by
*Brady* and its progeny into 'an empty promise, easily
circumvented by suppression of evidence by means of
destruction rather than mere failure to reveal.' *United
States* v. *Bryant*, [439 F.2d 642,] 648 [D.C. Cir. 1971]. *The
defendant is therefore entitled to relief for the Com-
monwealth's failure to preserve the [lost evidence] if he
establishes a 'reasonable possibility, based on concrete
evidence rather than a fertile imagination,' that access to
the [evidence] would have produced evidence favorable to
his cause. State* v. *Michener*, 25 Or. App. 523, 532 (1976)."
(Emphasis added.)

*Id.*

Two years later, in *Commonwealth* v. *Charles*, 397 Mass. 1
(1986) (*Charles*), the court returned to the difficulties presented
by lost or destroyed evidence, stating: "The loss [or destruc-
tion] of evidence presents special problems. . . . When
potentially exculpatory evidence is lost or destroyed, the culpabil-
ity of the government will be weighed along with the material-
ity of the evidence and the potential prejudice to the defend-
ant." *Id.* at 14.[7] The following year, in *Commonwealth* v. *Willie*,
400 Mass. 427 (1987) (*Willie*), we fleshed out more fully the

---

[7]Although not discussed directly, the court's reference in *Commonwealth* v.
*Charles*, 397 Mass. 1, 14 (1986), to *United States* v. *Arra*, 630 F.2d 836, 848,
849 (1st Cir. 1980), indicates that its decision to include the government's
culpability as a factor to be weighed in the balance was a recognition that the
government's loss or destruction of potentially exculpatory evidence presents
a substantively different situation from one where the government has with-
held such evidence. In the latter situation, as *Brady* v. *Maryland*, 373 U.S. 83
(1963) (*Brady*), and *United States* v. *Agurs*, 427 U.S. 97 (1976) (*Agurs*), make
clear, because the evidence in question still exists, what matters is whether
that evidence was in fact exculpatory; the good or bad faith of the government
is irrelevant. See *Brady, supra* at 87 ("the suppression by the prosecution of
evidence favorable to an accused upon request violates due process where the
evidence is material either to guilt or to punishment, irrespective of the good
faith or bad faith or the prosecution"). See also *Agurs, supra* at 110 ("If the
suppression of evidence results in constitutional error, it is because of the
character of the evidence, not the character of the prosecutor"). But where the
government has lost or destroyed the evidence claimed to be exculpatory,
there is no evidence to weigh or examine. The inherently difficult position in
which the government's action places the defendant makes it appropriate to
consider "not solely . . . the potential prejudice to the defendant from the
evidence's nonproduction as in *Brady* and *Agurs*, but also upon the
government's culpability." *United States* v. *Arra, supra* at 849.

balancing test that *Charles* had used. *Willie* was a case in which the court was reviewing reported questions concerning a pretrial motion to dismiss an indictment due to the loss or destruction of extracts of material with blood stains that the defendant sought to test to determine blood type. We explained in *Willie* that "when potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh [1] the culpability of the Commonwealth, [2] the materiality of the evidence and [3] the potential prejudice to the defendant." *Id.* at 432. With respect to the third factor of potential prejudice, we indicated that this factor of necessity must focus in part on the exculpatory nature of the evidence, and incorporated the *Neal* standard for making such a determination. In particular, we stated: "An analysis of the prejudice to the defendant necessarily involves an inquiry into the exculpatory nature of the evidence. Where evidence is lost or destroyed, it may be difficult to determine the precise nature of the evidence. While the defendant need not prove that the evidence would have been exculpatory, he must establish 'a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the [material] would have produced evidence favorable to his cause.' " *Id.* at 433, quoting *Neal*, 392 Mass. at 12.

In the years since *Charles* and *Willie*, the court has sometimes, but not always, taken a somewhat different approach in reviewing a defendant's claim for relief based on potentially exculpatory evidence that has been lost or destroyed. In particular, the court has required that, before the balancing test established in *Charles* and *Willie* will be performed, the defendant must satisfy an "initial burden" of demonstrating the exculpatory value of the lost or destroyed evidence as set out in *Neal*. See, e.g., *Commonwealth* v. *Cintron*, 438 Mass. 779, 784 (2003), where we stated:

> "A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has *the initial burden, Commonwealth* v. *Olszewski*, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835 (1994), to establish 'a "reasonable possibility, based on concrete evidence rather than a fertile imagination," that access to the [lost or

destroyed evidence] would have produced evidence favorable to his cause' (citations omitted). *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). *If he meets his initial burden,* 'a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant.' *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987)." (Emphasis added.)

Accord, e.g., *Commonwealth* v. *Clemente*, 452 Mass. 295, 309 (2008), cert. denied, 129 S. Ct. 1329 (2009)[8]; *Commonwealth* v. *Kee*, 449 Mass. 550, 554 (2007); *Commonwealth* v. *Dinkins*, 440 Mass. 715, 717 (2004). But see, e.g., *Commonwealth* v. *O'Day*, 440 Mass. 296, 305 (2003) (in reviewing denial of motion to dismiss based on destruction of evidence, court applied *Charles* [and *Willie*] balancing test directly; no mention of "initial burden" on defendant to establish exculpatory nature of destroyed evidence); *Commonwealth* v. *Harwood*, 432 Mass. 290, 295 (2000) ("When a defendant claims he is prejudiced by missing evidence, a judge must weigh the materiality of the evidence and the potential prejudice to the defendant, as well as the culpability of the Commonwealth and its agents"; no mention of defendant's "initial burden").

As this review reflects, there appears to be some inconsistency in our cases with respect to our consideration of lost or destroyed evidence that a defendant claims was exculpatory. Both the balancing test cases exemplified by *Charles* and *Willie* and their progeny, as well as the cases imposing an "initial burden" on the defendant, use the exact same test for assessing whether the defendant has sufficiently demonstrated the potentially exculpatory nature of the evidence at issue: has the defendant shown that there is a "reasonable possibility, based on concrete evidence" (*Neal*, 392 Mass. at 12), rather than speculation or surmise, that access to what was lost would have produced evidence favorable to his case. Compare, e.g., *Willie*, 400 Mass. at 433, with, e.g., *Commonwealth* v. *Cintron*, 438 Mass. at 784. The difference in

---

[8]Although it is implicit in the concept of an "initial burden," the *Clemente* case states explicitly that where the defendant does not meet that initial burden, "we do not reach the balancing test." *Commonwealth* v. *Clemente*, 452 Mass. 295, 309 (2008), cert. denied, 129 S. Ct. 1329 (2009).

the two lines of cases is that under the *Charles* and *Willie* line of cases, a consideration of the Commonwealth's culpability, if any, in that loss or destruction, as well as an evaluation of materiality, are also part of the initial calculus; under *Commonwealth* v. *Cintron, supra* and similar cases, the analysis is in two phases, and no consideration of government culpability or materiality need occur unless the exculpatory nature of the evidence is shown.

We seek to clarify and resolve the somewhat different approaches taken in our cases. When a defendant makes a claim that the government has lost or destroyed potentially exculpatory evidence, it makes sense that he or she should bear the initial burden of demonstrating the exculpatory nature of that evidence, using the *Neal* "reasonable possibility, based on concrete evidence" formulation. *Neal*, 392 Mass. at 12. We therefore hold that the defendant will be required to meet this threshold burden in order to advance a claim for relief. If the defendant does meet the burden, then, as indicated in, for example, *Commonwealth* v. *Cintron*, 438 Mass. at 784, and the other cases that have followed the lead of *Commonwealth* v. *Olszewski*, 416 Mass. at 714 (*Olszewski II*), the judge, or the court on appeal, must proceed to balance the Commonwealth's culpability, the materiality of the evidence, and the prejudice to the defendant in order to determine whether the defendant is entitled to relief.[9] If the defendant does *not* establish as a threshold matter that the evidence at issue is possibly exculpatory according to the *Neal* standard, there is no need to engage in this balancing test. See *Commonwealth* v. *Clemente*, 452 Mass. at 309. That does not necessarily mean, however, that the defendant must forgo pursuit of a remedy for culpable conduct by the Commonwealth.

Our cases indicate that where the Commonwealth has acted in bad faith or recklessly, resulting in the loss or destruction of evidence, the defendant may be independently entitled to a remedy even without meeting the *Neal* test. See, e.g., *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 747-749 (1986) (mo-

---

[9]See, e.g., *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 22-29 (1993) (in rape case, prosecutor authorized destruction of fetal tissue that in circumstances of case had reasonable possibility of being exculpatory; conduct of prosecutor found to be grossly negligent bordering on bad faith; when weighed with materiality of such evidence and prejudice to defendant, dismissal of rape indictment was necessary).

tions to suppress evidence of serological test results performed on defendants' boots should have been allowed where Commonwealth, in violation of pretrial conference agreement, effectively destroyed boots by testing, destruction was intentional or at least condoned by Commonwealth, evidence was material, and prejudice to defendants resulted; new trials ordered). See also *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 n.2 (1988) (*Olszewski I*) ("It would seem that culpability, in the sense of bad faith destruction or falsification of evidence, could present an independent ground for remedial action"). Moreover, even where the government's level of culpability is no greater than negligence, the defendant may still be entitled at trial to make an argument that focuses on such negligence — such as, for example, that the negligence reflects an inadequate or incompetent investigation by the government that may give rise to a reasonable doubt as to the defendant's guilt. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980).[10]

Returning to the instant case, as just indicated, the initial question to answer is whether the defendant established a reasonable and evidence-based possibility that the opportunity to observe Cellmark conduct the DNA testing in this case was exculpatory — i.e., that it "would have produced evidence favorable to his cause." *Neal*, 392 Mass. at 12. Our review of the record before the motion judge indicates that the defendant did not do so. The affidavits of Judith Floyd state that while

[10]Although we have never specifically been asked to decide whether, or to what extent, the spoliation doctrine applicable in civil cases should be applied in criminal cases, two cases cited in the text, *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 747-749 (1986), and *Commonwealth* v. *Olszewski*, 401 Mass. 749, 754 n.2 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994), in substance apply similar principles. The defendant here made no claim under a theory of spoliation, and there was no request for any of the "spectrum of remedies" available to redress spoliation. See *Scott* v. *Garfield*, 454 Mass. 790, 799 (2009), quoting *Gath* v. *M/A-Com, Inc.*, 440 Mass. 482, 488 (2003). We note, however, that the trial judge, at the request of the defendant's counsel, gave an instruction to the jury that focused (among other alleged failures) on the Commonwealth's failure to conduct tests with the defense expert present. The judge also explained that if the jury found such a failure to be significant, they could consider whether it (adversely) affected the reliability or quality of the Commonwealth's evidence, and "that had there been no [failure], it would have resulted in evidence favorable to the defendant."

there was a breakdown of case tracking and communication systems at Cellmark's Dallas laboratory that affected communications among different levels of Cellmark staff and also between Cellmark and its clients, the actual DNA analysis conducted in this case followed established Cellmark protocols that themselves had been specifically reviewed and approved by a number of public and private accrediting bodies. The judge invited the defendant to present an affidavit or testimony from his expert to explain the nature of what was lost by the expert's inability to be present for the testing, but neither an affidavit nor testimony was offered — the result of what appears to have been a conscious strategic decision by defense counsel. What remains is the defendant's claim that because there was an obvious degree of chaos in the over-all operation of Cellmark's Texas laboratory in the month the DNA testing occurred, it can and should be assumed that the chaos spilled over to affect the actual conduct of the DNA analysis. We agree with the general proposition that evidence tending to call into question the validity and quality of the DNA analysis in this case — and the credibility of Cellmark's laboratory director testified to both — would qualify as favorable to the defense, and exculpatory. See *Neal, supra* at 11-12. But on the record before us, which includes specific and extensive documentation of the DNA testing conducted, the defendant's assertion that had his expert been present at the testing, the expert could have witnessed and then testified about confusion and sloppiness in the actual conduct of the DNA analysis, is based on surmise and speculation. See *id.* at 12. It is difficult to disagree with the motion judge's conclusion that the presence of the defense expert as an observer of the testing might well have served to bolster the jury's view of the validity of the test results.

Because the defendant was unable to demonstrate a reasonable possibility that the lost opportunity to observe the testing was exculpatory, there was no need for the motion judge to undertake the task of balancing the Commonwealth's culpability, materiality of the evidence, and prejudice to the defendant.[11]

---

[11]The defendant makes no claim that the Commonwealth acted intentionally or in bad faith in this case — conduct that if found to exist, might provide an independent ground to seek relief. See note 10, *supra,* and accompanying text. As previously noted, however, at trial the defendant sought and the trial judge

The defendant's motion to suppress evidence of the DNA analysis was properly denied.[12]

3. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E, and conclude that neither a reduction in the murder verdict nor an order for a new trial is warranted. The full trial record indicates that the defendant was not prejudiced by his expert's inability to witness Cellmark's testing. Defense counsel ably cross-examined Judith Floyd, Cellmark's representative, concerning the chaos in the Dallas laboratory and its effect on sample processing, and brought Cellmark's past processing errors to the attention of the jury. This opportunity to "plant . . . seeds of doubt," *Commonwealth* v. *Dinkins*, 440 Mass. at 719, was very likely more than counsel would have been able to accomplish had Abbott actually been present for the tests. Supporting the view that defendant was not, in a broad sense, prejudiced by the inability to monitor Cellmark's testing was the judge's instruction to the jury concerning inferences that they could draw from the Commonwealth's handling of the matter. See note 10, *supra.* This instruction helped to remedy any possible disadvantage to the defendant.

*Judgments affirmed.*

gave a somewhat different version of a so-called *Bowden* instruction, see *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980), to highlight the Commonwealth's loss of his opportunity to have an expert observe and evaluate the DNA testing.

[12]Because we have concluded that the defendant failed to meet the *Neal* standard for showing the exculpatory nature of his lost opportunity to observe the DNA testing, we do not need to reach the second issue the defendant raises, namely, what is the appropriate standard to review the "materiality" of the claimed exculpatory evidence — an inquiry that focuses on the prejudice to the defendant derived from its loss or destruction. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 405-408, 412 (1992). However, we have no reason to disagree with the defendant's argument that where a defendant has specifically requested a particular item or type of evidence that qualifies as exculpatory, and that evidence is thereafter lost or destroyed by the government, his claim for relief should be governed by the same standard of review that we apply to a defendant who has made a specific request for still-existing exculpatory evidence that the government improperly withheld or failed to disclose. In the latter instance, the standard is that "a defendant need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure." *Id.*