## COMMONWEALTH *VS.* JOSE CINTRON.

Hampden. December 6, 2002. - March 6, 2003.

Present: GREANEY, SPINA, COWIN, & CORDY, JJ.

*Practice, Criminal,* Disclosure of evidence, Loss of evidence by prosecution, Preservation of evidence, Instructions to jury, Assistance of counsel, Argument by prosecutor, Capital case. *Evidence,* Exculpatory, Fingerprints. *Constitutional Law,* Assistance of counsel. *Deoxyribonucleic Acid.*

The judge in a murder case did not abuse his discretion in denying the defendant's motion to dismiss or, in the alternative, to suppress certain fingerprint evidence, based on the Commonwealth's alleged failure to preserve a latent fingerprint found on a wooden slat at the scene of the crime, where the defendant failed to show that the judge's finding that accepted a State trooper's testimony that he would have followed proper procedure in photographing the latent print was clearly wrong, where any culpability on the part of the Commonwealth in failing to preserve the print was harmless, and where it was not likely that the procedure used by the State trooper distorted the integrity of the fingerprint before it was photographed. [783-785]

At a murder trial, the judge did not err in failing to swear the jury before giving preliminary instructions. [785-786]

The defendant in a murder case was not denied the effective assistance of counsel by counsel's failing to conduct cross-examination of the Commonwealth's fingerprint and deoxyribonucleic acid (DNA) experts, failing to offer evidence to refute their testimony, or suggesting, in closing argument, that the jury could accept the fingerprint and DNA evidence as irrefutable, where the defendant did not demonstrate that counsel abandoned his defense, that counsel deprived him of an otherwise available defense, or that counsel's trial strategy was unreasonable when made. [786-788]

At a murder trial, the prosecutor did not improperly shift the burden of proof to the defendant when he suggested that the defendant had an obligation to refute certain fingerprint and deoxyribonucleic acid evidence where, although the argument might well have been improper in other circumstances, in the context of the entire argument, and in light of defense counsel's closing argument, the prosecutor's comment was an isolated one on the strength of the Commonwealth's case, and the prosecutor did not suggest that the defendant had to prove anything. [788-789]

INDICTMENT found and returned in the Superior Court Department on January 13, 1998.

Pretrial motions to dismiss or to suppress evidence were heard by *Francis R. Fecteau,* J., and the cases were tried before *Judd J. Carhart,* J.

*Michael Malkovich* for the defendant.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. On appeal he claims that the trial judge erred by (1) failing to swear the jury before giving preliminary instructions, and (2) denying his motion to dismiss or, alternatively, to suppress certain fingerprint evidence, based on the Commonwealth's alleged failure to preserve a latent fingerprint found on a wooden slat. The defendant also claims (3) that he was denied the effective assistance of counsel where counsel conducted no cross-examination of the Commonwealth's fingerprint and deoxyribonucleic acid (DNA) experts, offered no evidence to refute their testimony, and in his closing argument suggested that the jury could accept the fingerprint and DNA evidence as irrefutable, and (4) that the prosecutor, in his closing argument, improperly suggested that the defendant had an obligation to refute the fingerprint and DNA evidence. We affirm the conviction and decline to exercise our power under G. L. c. 278, § 33E.

1. *Background.* The victim, a seventy-four year old woman, lived alone in a fifth floor apartment in Holyoke. On August 2, 1984, the victim's sister telephoned the Holyoke police after she went to visit the victim and found the apartment in shambles. The bedroom was dark, so she did not enter. The police arrived and entered the bedroom, where they discovered the victim's body lying face down on the floor. Blood was spattered and smeared throughout the apartment.

The victim suffered four lacerations and multiple contusions of her head, defensive wounds on her right hand, and three knife wounds to her back, two of which were stab wounds. One stab wound penetrated her small intestine. The second stab wound punctured her right lung, causing it to collapse and producing a significant loss of blood. The second stab wound also produced death and was likely accompanied by severe

pain. A laceration above the victim's right eye was caused by blunt force from an object such as a club or a stick. Lacerations at the top and back of her head also were caused by a club or stick. One laceration at the top of her head was caused by a knife.

It could be inferred that robbery was the motive for the killing, as the victim's television set was missing, and two pocketbooks were open on the sofa with their contents spilled out. It also could be inferred that the intruder had entered the apartment through the bedroom window from a fire escape, as the window was open and there were no other signs of entry.

Among the items seized from the apartment were a wooden bed slat leaning against a bedroom wall,[1] a bloody rag from the kitchen floor, and a bloody rag from the bathroom. Blood stains were found on the curtains over the bedroom window that opened onto a fire escape. In the alley below the fire escape police found a bloody rag, a cardboard box with a bloody fingerprint, and a tin plate with blood on it.

Trooper Charles Yagodzinski of the State police photographed the apartment, the fire escape, and the items found in the alley before any item was seized. He also processed the scene for fingerprints and found two latent prints on the bedroom window sill, a bloody print on the wooden bed slat, and a bloody print on the box found in the alley. He sprayed the prints on the bed slat and the cardboard box with ninhydrin, a chemical that enhances the visibility of latent fingerprints but also accelerates their deterioration.

No witness to the murder was ever found. For eighteen months, hundreds of fingerprint cards were sent to Yagodzinski for comparison, but no match was made. As early as August 8, 1984, the chief of police of Holyoke suggested that the defendant be considered a suspect, and the defendant's fingerprint card on file with the Holyoke police department was sent to Trooper Yagodzinski. However, as Yagodzinski and his colleagues at the State police laboratory kept no record of whose fingerprint card was examined, there was no way of determining whether the prints on the defendant's card were ever

---

[1] It could not be determined whether the wooden bed slat was originally in the apartment or whether it had been brought there.

compared at that time with the photographs of the crime scene prints.

In 1986, the State police acquired an automated fingerprint identification system (AFIS), a computerized fingerprint filing and identification system. Under AFIS, fingerprint images are first enlarged five times, and a hand tracing is made by a technician. The traced image is then reduced by a factor of five and scanned into the AFIS-equipped computer, where its features are converted mathematically (by trigonometric and logarithmic functions) into data that are then classified for purposes of comparison with other prints similarly processed. Between 1986 and 1997 fingerprint technicians repeatedly entered the prints found at the crime scene into AFIS, but no match was made. The defendant's fingerprints had been entered in the AFIS database, but they had not been matched to the crime scene prints.

In 1997, Lieutenant Brian O'Hara of the State police arranged for the manual review of fingerprint cards on file with the Holyoke police department because, in his experience, AFIS was not always reliable. Because there were approximately 40,000 cards and because the prints recovered from the wooden slat and the cardboard box had whirl patterns, he decided to examine only those cards with a "whirl" pattern. There were approximately 14,000 such cards, and O'Hara had estimated the task would take about 400 hours. Work began in July, 1997, and on October 16, 1997, the defendant's right middle fingerprint was matched to the latent fingerprints on the wooden slat and on the box. State police protocol requires eight points of comparison to make a positive identification. O'Hara found twenty-four points of comparison between the defendant's file card fingerprints and the prints on the slat and the box. The prints on the bedroom window sill leading to the fire escape were never identified.

The defendant had moved to Florida, and on November 7, 1997, Sergeant Stephen Griffin of the State police and Detective David Beauchemin of the Holyoke police department interviewed him there. The defendant told them that he had been at a shoeshine business in the basement of the apartment house where the victim lived, but had never been in any other part of

the building. The defendant was arrested in Florida the next day and was returned to Massachusetts one month later.

On the Commonwealth's motion the defendant was ordered to produce a blood sample. The sample was forwarded to Cellmark Diagnostics for DNA analysis, together with blood samples from the rags found in the kitchen and bathroom of the victim's apartment, and the rag and the tin plate found in the alley. Using a polymerase chain reaction (PCR) based analysis, a statistical match was made between the defendant's DNA and the DNA extracted from the three bloody rags and the tin plate. The analysis excluded 99.9999992 per cent of the Caucasian population, 99.9998 per cent of the African-American population, and 99.9999996 per cent of the Hispanic population as the source of the DNA.

2. *Motion to dismiss or suppress.* The defendant filed a motion to dismiss the indictments or, alternatively, to suppress evidence of the fingerprint on the wooden slat based on the alleged loss or destruction of the fingerprint. An evidentiary hearing on the motion was conducted by a judge who was not the trial judge. While the motion was under advisement the defendant filed a supplemental motion to suppress the results of DNA testing on the ground that the testing was the fruit of the lost or destroyed fingerprint evidence. Both motions were denied.

The defendant argues that the motions should have been allowed because Trooper Yagodzinski failed to employ known methods to preserve the latent fingerprint found on the wooden bed slat, and because Yagodzinski photographed the prints after treating them with ninhydrin. He contends that the original print had so deteriorated because of the application of ninhydrin that by the time he was indicted only three points of comparison were discernible and his experts were unable to evaluate that print. The cardboard box, on which a second latent print was identified as the defendant's, had inexplicably disappeared and thus was unavailable for evaluation by the defendant's experts.[2] Although photographs of the latent fingerprints taken on

---

[2] The defendant did not raise the question of the loss of the cardboard box in his pretrial motions. The issue has not been preserved, but we review the claim under G. L. c. 278, § 33E, to determine whether the loss of the box by

August 2, 1984, by Yagodzinski were available to the defendant's experts for evaluation, the defendant contends that without the original prints he was denied both the opportunity to challenge the accuracy of the photographs of the ninhydrin-enhanced fingerprints, which constituted the basis for identifying and arresting him, and therefore the validity of his arrest, which led to his blood sample for DNA testing.

A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden, *Commonwealth* v. *Olszewski*, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835 (1994), to establish "a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [evidence] would have produced evidence favorable to his cause" (citations omitted). *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). If he meets his initial burden, "a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant." *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). When reviewing the denial of a motion to dismiss based on the Commonwealth's alleged loss of exculpatory evidence, we accept the judge's subsidiary findings in the absence of clear error. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 230 (1991). We will not disturb the judge's decision except for a clear abuse of discretion. See *Commonwealth* v. *Perito*, 417 Mass. 674, 684 (1994).

The motion judge rejected the defendant's assertion that the photographs were taken after ninhydrin was applied. He found that the photographs were "taken immediately after the discovery of the prints, in 1984 . . . and . . . the photographs taken of the prints in question were done in accordance with proper protocols." Although Yagodzinski had no specific recollection whether he photographed the latent prints before or after applying ninhydrin, he testified that proper procedure would have been to photograph them before applying ninhydrin, and he would have followed proper procedure. The judge accepted

the Commonwealth constituted misconduct that created a substantial likelihood of a miscarriage of justice.

that explanation and the defendant has failed to show that the judge's finding was clearly wrong.

The defendant has shown no prejudice from the loss of the original fingerprint. The photograph of the original fingerprint on the wooden slat, not the original fingerprint itself, formed the basis for identifying him in 1997. The defendant's expert had the photograph of the 1984 crime scene prints to compare with the defendant's known prints, and thus the defendant had access to the same information relied on by the Commonwealth to make the identification. See *Commonwealth* v. *Hunter*, 426 Mass. 715, 718-719 (1998). Any culpability on the part of the Commonwealth in failing to preserve the original print was harmless. "[T]he defendant has made no showing that access to the fingerprint itself might have provided anything more favorable to his cause than the photographs did." *Id.* at 719.

The judge addressed the other aspects of the defendant's assertions of inadequacies in the Commonwealth's handling of the fingerprint evidence by relying on our decision in *Commonwealth* v. *Phoenix*, 408 Mass. 409, 413-415 (1991), which is dispositive. The photograph of the original fingerprint on the wooden slat adequately preserved the evidence for the defendant. *Id.*

Even if the photograph had been taken after the application of ninhydrin, it is not likely that the chemical distorted the integrity of the fingerprint before it was photographed. Evidence indicated that, although ninhydrin may cause blood to fade or disappear, it does not alter the image of a fingerprint. The photograph, which was reported by the defendant's expert to be of "excellent quality," would have been taken shortly after the application of ninhydrin, and it depicts a clear, high resolution image of a fingerprint. The judge did not abuse his discretion in denying the defendant's motion to dismiss or suppress.[3]

3. *Preliminary instructions.* The defendant assigns error to the judge's failure to swear the jury before giving preliminary instructions at trial. Preliminary instructions, while common, are

---

[3]There is no merit to the defendant's parallel but unpreserved claim concerning the fingerprint on the cardboard box. Because that fingerprint, unlike the one on the wooden slat, was found outside the victim's apartment, it was not the one that led to the defendant's arrest.

not required. There is no requirement that the jury be sworn before the judge gives preliminary instructions. Such instructions, even if given to the entire venire during the jury selection process, will be considered along with the judge's final instructions in deciding whether the instructions were correct. See *Commonwealth* v. *Corliss*, 371 Mass. 266, 267-268 (1976); *Commonwealth* v. *Green*, 25 Mass. App. Ct. 751, 753 (1988). The defendant points to no error in the preliminary instructions, and we perceive none.

4. *Assistance of counsel.* The defendant asserts that he was denied the effective assistance of counsel because counsel failed to cross-examine the Commonwealth's fingerprint and DNA experts, or to offer any evidence to challenge their opinions. He further faults counsel for inviting the jury to accept the Commonwealth's fingerprint and DNA evidence as "irrefutable," and the testimony of the Commonwealth's witness as truthful.

We review a claim of ineffective assistance of counsel in an appeal from a conviction of murder in the first degree under the standard of G. L. c. 278, § 33E, which is "more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). In reviewing such a claim we are not limited to the adequacy of trial counsel's performance but consider whether any "error in the course of the trial (by defense counsel, the prosecutor, or the judge) . . . was likely to have influenced the jury's conclusion." *Id.* Trial counsel's tactical decisions are accorded "due deference. . . . Unless such a decision was 'manifestly unreasonable when made,' we will not find ineffectiveness." (Citations omitted.) *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002).

Trial counsel filed several pretrial motions seeking to exclude the Commonwealth's fingerprint and DNA evidence, which was the only evidence linking the defendant to the crime. He obtained funds for experts to mount his challenges. He also obtained funds to hire an investigator to interview witnesses. As previously noted, one defense expert indicated that the photograph of the fingerprint on the wooden slat was qualitatively excellent. He further indicated that matching them to any known prints of the defendant would be "child's play." The

defendant has failed to show how cross-examination of the Commonwealth's experts would have helped his case, or how calling experts to challenge the Commonwealth's experts would have been fruitful in any meaningful way.

The record before us indicates that experienced trial counsel did not challenge the Commonwealth's formidable fingerprint and DNA evidence, but instead pursued a theory that the defendant had been injured in a fight in the alley below the victim's apartment, that his fingerprint and blood were deposited on certain items during the fight, and that some of those items subsequently were transported to the victim's apartment by others. Under this theory, the Commonwealth's forensic evidence would be of no consequence.

Trial counsel quietly and methodically elicited evidence in support of this theory, which he then laid out in his closing argument. In his closing, counsel referred to a memorandum from the chief of police of Holyoke, dated August 8, 1984, indicating that the defendant was seen with a bandage on his hand to protect a cut received during a fight in the alley below the victim's apartment. He argued that the presence of the defendant's blood on the tin plate, the cardboard box, and the bloody rag found in the alley was consistent with the defendant's bleeding as a result of the injury received during that fight. Citing evidence that the bloody rag in the alley had once been part of the bloody rag found in the victim's bathroom, counsel explained the presence of the defendant's blood on the rags found in the victim's kitchen and bathroom as also consistent with his having bled as a result of the fight in the alley. He argued that the bloody rags were brought into the apartment by the murderer. Counsel also argued that the victim's DNA was not on the rags in the apartment, as one would expect, and this was consistent with the theory that the defendant's blood was left on the rags during the fight in the alley and later brought inside to lead police to the defendant.

The most dramatic point, however, involved the photograph of the wooden slat taken by Yagodzinski in the victim's bedroom. Counsel pointed out that the photograph showed blood dripping in an "uphill" pattern. He then directed the jury's attention to an earlier photograph taken by a member of the Holy-

oke police department depicting items in the alley, which, he argued, included the same wooden slat. Counsel made great use of police mishandling of evidence, e.g., the lost cardboard box, to press his point that the slat had to have been moved into the apartment from the alley by police after the blood had dried, because the blood could not have flowed uphill as shown in the Yagodzinski photograph. Finally, counsel argued that the defendant was telling the truth when he told police he had never been above the basement of the victim's apartment building. All the defendant's blood, he argued, was deposited in the alley and carried upstairs.

Defense counsel's explanation as to how the defendant's blood and fingerprints came to be inside the victim's apartment without the defendant himself being there was well conceived and grounded in multiple sources of the evidence. Moreover, because his theory was not inconsistent with the overwhelming fingerprint and DNA evidence presented by the Commonwealth, he could safely concede that such evidence was "irrefutable" and dismiss its significance.

Counsel also emphasized during trial that the victim's open purses had not been dusted for fingerprints. The Commonwealth had relied on the condition of the purses to support its felony-murder theory and the armed robbery indictment. The jury acquitted the defendant of those charges.

The defendant has failed to show how "better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). He has not demonstrated that counsel abandoned his defense, that counsel deprived him of an otherwise available defense, or that counsel's trial strategy was unreasonable when made. *Commonwealth* v. *Harbin*, *supra* at 656. There was no ineffective assistance of counsel.

5. *The prosecutor's closing.* The defendant argues that the prosecutor improperly shifted the burden of proof to the defendant when he argued in closing that the DNA evidence was "so powerful and so reliable that the defendant chose to not even attempt to refute it, and I submit that what you were left with was an overwhelming case of this defendant's guilt." In other circumstances, the argument might well be improper.

However, in the context of the entire argument, see *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984), and in light of defense counsel's closing argument, we are satisfied that this was an isolated comment on the strength of the Commonwealth's case, and that the prosecutor did not suggest that the defendant had to prove anything. The defendant did not object or request a curative instruction which, "[a]lthough not dispositive of the issue . . . is some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). There was no error.

6. *General Laws c. 278, § 33E.* We have reviewed the briefs, the transcripts, and the entire record and see no reason to reduce the verdict or grant the defendant a new trial.

*Judgment affirmed.*