## Commonwealth vs. Jerry Meas.

Middlesex. November 8, 2013. - March 12, 2014.

Present: Ireland, C.J., Spina, Cordy, Duffly, & Lenk, JJ.

*Homicide. Practice, Criminal,* Indictment, Loss of evidence by prosecution, Jury and jurors, Instructions to jury, Capital case. *Constitutional Law,* Indictment, Identification, Jury. *Due Process of Law,* Identification, Loss of evidence by prosecution. *Evidence,* Identification, Videotape, Exculpatory, Bias. *Identification. Witness,* Bias, Immunity. *Jury and Jurors.*

A criminal defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution were not violated on the ground that an indictment charging him with murder did not specify any theory of murder, where the indictment was in the form prescribed by G. L. c. 277, § 79. [435-436]

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress the results of a showup identification procedure conducted by police after stopping a vehicle occupied by the defendant and three other individuals that bore a license plate and description similar to those reported to police as having been involved in a shooting earlier that night, where, in the circumstances, the police had good reason to conduct the showup and the defendant did not meet his burden of showing by a preponderance of the evidence that it was unnecessarily suggestive. [440-443]

At a murder trial, the judge did not abuse his discretion in allowing the admission in evidence of two surveillance videotape recordings showing, at two angles, the area surrounding a convenience store at the time of a shooting, where it was fairly speculative that a videotape showing a third angle that was lost by police would have been exculpatory; and where the defendant was not prejudiced from the loss, in that he was able, during cross-examination of police officers, to exploit the lost evidence by casting doubt on the thoroughness and accuracy of the police investigation. [448-449]

At a criminal trial, the judge did not abuse his discretion in precluding the defendant from inquiring on cross-examination into a Commonwealth witness's possible bias, where such claims of bias were grounded only in speculation. [449-451]

At a murder trial, the judge did not abuse his discretion in declining to discharge a juror who reported that someone had thrown a painted rock through the window of her husband's automobile when it was parked at their home, where the judge promptly brought the matter to the attention of counsel and conducted a voir dire examination of the juror before she had contact with any other jurors; and where, even if the juror made a connection between the color of the paint and the gang of which the defendant was allegedly a member, the juror stated explicitly that she was able to be fair and impartial. [451-452]

At a criminal trial, there was no error in the judge's instruction concerning a showup identification procedure. [452-453]

At a criminal trial, the judge erred in declining to give an instruction to the jury regarding the particular care they should use in examining a Commonwealth witness's testimony, where the witness was granted immunity and the prosecutor, on redirect examination, elicited that the witness had promised to tell the truth; however, considering the weight of the evidence and the judge's instructions to the jury to consider whether any witness had a motive for testifying in a certain way, displayed a bias, or had an interest in the outcome of the case, this court could say with fair assurance that the judgment was not substantially swayed by the error. [453-455]

INDICTMENTS found and returned in the Superior Court Department on June 29, 2006.

A pretrial motion to suppress evidence was heard by *Kenneth J. Fishman*, J., and the cases were tried before him.

*David H. Mirsky* for the defendant.

*Jessica Langsam*, Assistant District Attorney (*Elizabeth Dunigan*, Assistant District Attorney, with her) for the Commonwealth.

IRELAND, C.J. On December 16, 2008, a jury convicted the defendant, Jerry Meas, of murder in the first degree on a theory of deliberate premeditation and of unlawful possession of a firearm.[1] Represented by new counsel on appeal, the defendant argues error in (1) the form of the murder indictment; (2) the denial of his motion to suppress identification evidence; (3) the admission at trial of surveillance videotape recordings; (4) the judge's limitation on cross-examination of a witness on the issue of bias; (5) the judge's decision not to discharge a juror; and (6) the judge's instructions to the jury. We affirm the order denying the defendant's motion to suppress and affirm his convictions. We discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1. *Form of indictment.* Contrary to the defendant's contention, his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution were not violated on the ground that the murder indictment did not specify any theory of

---

[1]The defendant also was indicted on a charge of being an armed career felon, see G. L. c. 269, § 10G (*c*). The Commonwealth filed a nolle prosequi with respect to that charge.

murder. Because the indictment in this case is in the statutory form prescribed by G. L. c. 277, § 79, it "encompasses all theories of murder in the first degree and is sufficient to charge murder by whatever means it may have been committed." *Commonwealth* v. *DePace*, 442 Mass. 739, 743 (2004), cert. denied, 544 U.S. 980 (2005). The cases to which the defendant cites have no application here. The case of *Blakely* v. *Washington*, 542 U.S. 296, 304 (2004), concerns certain constitutional requirements for enhanced penalty sentencing, and *Apprendi* v. *New Jersey*, 530 U.S. 466, 490 (2000), is similarly without force. See *Commonwealth* v. *DePace*, *supra* ("The *Apprendi* case was not concerned with the sufficiency of a grand jury indictment"). See also *Commonwealth* v. *Morales*, 453 Mass. 40, 52 (2009) (declining to overrule *Commonwealth* v. *DePace*, *supra*, and stating that form of indictment does not offend *Apprendi*).

2. *Suppression of identification evidence.* The defendant argues that the judge[2] erred in denying his motion to suppress the results of the showup identifications made in the aftermath of the shooting. He claims that the identification procedure was "unnecessarily and unconstitutionally suggestive." After conducting an evidentiary hearing, the judge denied the motion, concluding that there was good reason to use the showup identification procedure and that the identifications did not violate due process. We set forth the material evidence from the hearing as summarized in the judge's findings of fact.

On June 13, 2006, at approximately 11 P.M., the victim was shot and killed while seated in the driver's seat of his automobile, which was parked in front of a convenience store located at the corner of Chelmsford and Westford Streets in Lowell. With the victim at the time were his friend, Vicheth San, who sat in the front passenger seat, and his niece, Vannika Pen, who was in the rear passenger seat. Other witnesses to the shooting or events surrounding the shooting included Douglas Anderson, Fernando Badillo, and Pedro Garcia Cardona.

Before the shooting, the victim parked his automobile in a spot in front of the store. Nearby there was a black Honda

---

[2]The judge who ruled on the motion also was the trial judge.

Accord automobile in a parking spot. The Honda's driver, who was Cambodian, and an individual seated in the rear passenger seat of that vehicle stared at the occupants of the victim's automobile. Inside the store, Badillo observed the defendant being loud and acting tough. Badillo described the defendant as an Asian male with long dark hair worn in a ponytail. Badillo observed that the defendant was wearing a bandana, black hat, black jacket, and dark-colored khaki pants.

After the defendant left the store, he approached the victim's automobile, speaking to the victim as he approached. The victim told the defendant to "calm down."

Another passenger of the Honda, who was wearing a hat with a "B" on it, went to the passenger's side of the victim's automobile and asked San, "What up, Blood?" The defendant then raised a firearm and shot the victim. He tried to shoot the gun again, but it did not discharge and only made clicking noises. The defendant and the other individual returned to the black Honda and drove down Chelmsford Street.

Within minutes of the shooting and in response to a 911 telephone call, Lowell police officers stopped a black Honda Accord with a very similar license plate number to that which had been provided to the police. This stop occurred at the corner of Branch and School Streets, approximately four to five blocks, or one-quarter mile, from the store.

The four occupants of the Honda were ordered out of the automobile, pat frisked for weapons, and handcuffed. The officers knew the occupants as members of the "Asian Boyz" gang. In addition to the defendant, the occupants of the automobile included Phalla Nou, Yoeun Chhay, and a juvenile with the street name "Silent." Chhay was found with a serrated knife, and a loaded gun was located on the floor of the rear passenger's side of the Honda, where Silent had been seated. A shell casing was found on the floor of the rear driver's side, where the defendant had been seated.

The police decided to conduct showup identification procedures at the location where the black Honda Accord had been stopped. This area was near a liquor store parking lot, and flood lights from that store, as well as street lights and lights from police cruisers on the scene, contributed to illuminating the

location. The showups were purportedly conducted in accordance
with "Eyewitness Identification Procedure Guidelines" prepared
by the Middlesex County district attorney's office. There were
at least six uniformed police officers in the area of the showup
as well as multiple police cruisers. The four men from the black
Honda were placed in a line and handcuffed behind their backs.
For each of the five identification procedures that night, a
"Show-Up Identification Checklist" form was used. One side
of that form contained the following advisements to be given to
witnesses before the presentation:

> "1. You are going to be shown an individual.

> "2. This may or may not be the person who committed
> the crime, so you should not feel compelled to make an
> identification.

> "3. It is just as important to clear innocent people, as it is
> to identify possible perpetrators.

> "4. Whether or not you identify someone, the police will
> continue to investigate.

> "5. After you are done, I will not be able to provide you
> with any feedback or comment on the results of the process.

> "6. Please do not discuss this identification procedure or
> the results with other witnesses in this case or with the
> media.

> "7. Focus on the event: the place, view, lighting, your
> frame of mind, etc. Take as much time as you need.

> "8. People may not appear exactly as they did at the time
> of the [e]vent, because features such as clothing and hair
> style may change, even in a short period of time.

> "9. As you look at this person, tell me if you recognize
> him/her. If you do, please tell me how you know the person,
> and in your own words, how sure you are of the identi-
> fication."

There were check boxes next to each of the enumerated advise-

ments to enable the officer conducting the showup to indicate which advisement was given to the witness, and the form contained signature and date lines for the witness and the officer to fill in. The other side of the form required the officer to identify himself, other officers present, and the witness, and to indicate the number of persons shown to the witness and the circumstances warranting the showup, including the proximity of the crime and the match of the description provided. The form also provided space to indicate the characteristics of the showup, including its location, the lighting, and the position of the suspects, as well as the location of police officers to the suspects and whether the suspects were wearing handcuffs. The form further provided a space for statements made during the identification procedure by other people.

From 11:11 P.M. on June 13, 2006, to at least 12:15 A.M. on June 14, 2006, five showup procedures were conducted. The first witness was Anderson, who identified Nou as the shooter. Thereafter, Anderson was not taken to the police station to provide a formal statement.

At 11:20 P.M., Badillo was next taken to the showup. Badillo recalled receiving the advisements from the police and observing six to ten cruisers and six to eight police officers in the area of the identification. He was not pressured by the police to select anyone, and he identified the defendant based on the clothing he had observed earlier. Badillo stated that the defendant was "definitely him." Badillo was approximately two to three car lengths away when he made his identification of the defendant as the shooter.

Cardona was the third witness to view the suspects, at 11:35 P.M., and he, too, signed an advisement form. He observed six cruisers at the showup scene and made his identification from ten yards away. Cardona had heard shots while parked at the store and had observed the shooter and the vehicles. Cardona identified the defendant as the shooter, having observed that the shooter was an Asian male with long hair who wore black pants and a blue bandana around his neck.

San was the next identifying witness, at 11:53 P.M. He signed an advisement form and identified the defendant as the shooter. He specifically indicated that the shooter was the individual

who was wearing a white and black Dickies-brand hat. San also identified the other individual in the line with a hat (Nou) as the other person who had come out of the black Honda. San further identified the black Honda Accord that he sighted parked nearby. San observed two or three police officers and two or more police vehicles at the scene of the showup, and made his identifications at an approximate distance of fifteen yards from the suspects. Unlike the other witnesses, San recalled being told by police that he was going to be shown the individuals whom the police had caught and who were probably the individuals who had shot the victim. He also recalled signing the advisement form and having it read to him.

At 12:15 A.M., Pen was escorted to the location of the showup. Although she was able to describe what the men from the shooting wore, she retracted an initial identification of the defendant as the shooter because she was not sure about his face and purportedly did not want to pick out the wrong person. The identification checklist form indicates that she was unable to make an identification. Pen was clearly frightened.

After the showup identifications were completed, at some point after 12:45 A.M., the defendant and the other occupants of the black Honda were transported to the Lowell police station.

In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [the judge's] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). For exclusion of an identification, "the defendant bears the burden of demonstrating, by a preponderance of the evidence, that the 'witness was subjected by the State to a confrontation that was unnecessarily suggestive and thus offensive to due process.' " *Commonwealth* v. *Johnson*, 420 Mass. 458, 463 (1995), quoting *Commonwealth* v. *Botelho*, 369 Mass. 860, 866 (1976). See *Commonwealth* v. *Odware*, 429 Mass. 231, 235 (1999) ("Common-law principles of fairness are another basis to exclude witness identification testimony"). "In deciding whether a particular confrontation [involving identification] was 'unnecessarily suggestive,' the judge is to consider 'the totality of the circumstances surrounding it.' "

*Commonwealth* v. *Botelho, supra* at 867, quoting *Stovall* v. *Denno,* 388 U.S. 293, 302 (1967).

The defendant argues that no exigent circumstances existed justifying a showup identification procedure and that, instead, a lineup at the nearby police station should have been conducted. It is true that "[o]ne-on-one identifications are generally disfavored because they are viewed as inherently suggestive." *Commonwealth* v. *Martin,* 447 Mass. 274, 279 (2006), citing *Commonwealth* v. *Johnson, supra* at 461. However, we have explained:

> "[A] one-on-one pretrial identification raises no due process concerns unless it is determined to be *unnecessarily* suggestive. Whether an identification is 'unnecessarily' or 'impermissibly' suggestive . . . involves inquiry whether good reason exists for the police to use a one-on-one identification procedure . . . bearing in mind that . . . '[e]xigent or special circumstances are not a prerequisite to such confrontation.' " (Emphasis in original.)

*Commonwealth* v. *Austin,* 421 Mass. 357, 361 (1995), quoting *Commonwealth* v. *Harris,* 395 Mass. 296, 299 (1985). "Relevant to the good reason examination are the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track." *Commonwealth* v. *Austin, supra* at 362. Each case is fact dependent and the existence of "good reason" presents "a question of law for the appellate court to resolve on the facts found by the motion judge." *Id.*

Here, the police had very good justification for resorting to the showup procedure. The crime involved the use of a deadly weapon, a firearm, that was not recovered at the scene. Thus, the nature of the crime presented public safety concerns, as well as the need for efficient police investigation in its immediate aftermath. The showups were promptly conducted in relation to the time of the shooting, with the first occurring within minutes of the shooting and the last just over one hour after the shooting.

See *Commonwealth* v. *Bowden*, 379 Mass. 472, 479 (1980), quoting *Commonwealth* v. *Barnett*, 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977) (concluding that "[s]howups of suspects to eyewitnesses of crimes have been regularly held permissible when conducted by the police promptly after the criminal event"). See also *Commonwealth* v. *Barnett, supra* at 89, 91-94 (showup within one hour after crime; confrontation not impermissibly suggestive). The four individuals included in the showups were stopped in a vehicle that bore a similar licence plate and description to that reported to police as having been involved in the incident, and in the geographical vicinity of the location of the shooting. The prompt viewing of the suspects at the location of the motor vehicle stop guided police in determining whether they were dealing with the shooter or should pursue other leads to locate an armed fleeing suspect.

The showup was not rendered impermissibly suggestive on account of the manner in which it was conducted. The fact that the suspects were viewed under ample illumination and while they were in handcuffs and obviously in custody does not, in the circumstances, create a level of unfairness that violates due process. See *Commonwealth* v. *Phillips*, 452 Mass. 617, 628-629 (2008), and cases cited. Illumination was needed in view of the fact that the identifications took place during the late evening and into the early morning. See *id*. Further, the need for public safety and to avoid the escape of the suspects was imperative. One of the suspects had been found with a serrated knife on his person, and a loaded gun was recovered in the vehicle the four suspects had occupied. All four men were known to the officers who had made the stop as gang members. The number of police officers and cruisers, while perhaps more than necessary, in the circumstances did not create an impermissibly suggestive showup identification procedure.

A showup is not necessarily impermissibly suggestive because police advise the witness that someone matching the description he or she has given has been apprehended. See *id*. at 628 (identification procedure not unnecessarily suggestive because witness may have heard on police radio that he was about to view suspect); *Commonwealth* v. *Williams*, 399 Mass. 60, 67 (1987) (no due process violation where police officer expressed

confidence that he had "got the guys"). "A witness ordinarily expects to be asked to make an identification of someone who either fits the description of a suspect or is suspected to have been involved in the reported crime." *Commonwealth* v. *Phillips, supra.* See *Commonwealth* v. *Harris,* 395 Mass. 296, 299-300 (1985), quoting *Commonwealth* v. *Perretti,* 20 Mass. App. Ct. 36, 42 (1985). As the judge reasoned, although there had been a statement to San expressing the conclusion of police that the shooter was probably among those that the witness was about to observe, that remark was tempered by the other advisements that had been provided to him. All of the remaining witnesses who had identified the defendant had been carefully and appropriately advised about the identification procedure without any suggestion or indication by police concerning who they believed was the shooter. Compare *Commonwealth* v. *Silva-Santiago,* 453 Mass. 782, 797-798 (2009) (establishing protocol to be followed before photographic array identification procedure).

Last, we reject the defendant's contention that various other factors rendered the showup identification procedure unreliable. It was not improper for Cardona and San to identify the shooter based on each man's memory of what clothing the shooter wore, particularly where the clothing was rather distinctive (e.g., bandana and the Dickies-brand hat). See *Commonwealth* v. *Amaral,* 81 Mass. App. Ct. 143, 149 (2012). The fact that not all of the witnesses identified the defendant as the shooter does not render the positive identifications inadmissible and unreliable. Rather, the conflicting testimony was a matter to be pursued at trial and one for the jury to resolve.

We conclude that, in the circumstances, the police had good reason to conduct the showup identification procedure and the defendant has not met his burden of showing by a preponderance of the evidence that he was subjected to a showup identification procedure that was unnecessarily suggestive. The judge ruled correctly on the defendant's motion to suppress.

3. *Trial.* a. *Facts.* Based on the Commonwealth's evidence, the jury could have found the following facts. During the evening of June 13, 2006, the defendant went to a cookout at Nou's home in Lowell. Fellow members of the Asian Boyz gang were

present, including Chhay and Silent.[3] The defendant had a gun, which he passed around for people to see.

The cookout was interrupted by a gunshot coming from the street in front of the house. Nou later told police that two automobiles — a blue Honda Civic and a red Acura — had passed by his house. Nou relayed that someone in the red Acura had shot at him while he was holding his infant son. Nou recounted also that, a few weeks before, someone had shot at his house.

Sometime after the gunshot sounded, Nou drove the defendant, Chhay, and Silent to the store to purchase cigarettes.[4] He parked to the right of the front door, and the defendant[5] and Chhay went inside.

The victim, who was driving a red Acura and was accompanied in the front seat by San, and in the back seat by Pen, stopped at the store and parked in front of its door. The black automobile was parked a few spaces over on the passenger's side of the red Acura. Nou[6] thought the victim and San were "Bloods" because they were wearing red, the color of the rival gang, and he and San exchanged insults. Thereafter, the defendant[7] and Chhay[8] departed the store. Nou said something to them, after which Chhay went over to San and asked whether he was a Blood.

Because the facts concerning what next transpired, namely, the shooting, generally mirror those found by the judge on the motion to suppress identification evidence, we need not repeat

---

[3]The Asian Boyz gang is a "Crip" gang and is associated with the color blue. One of its rival gangs is the "Bloods," whose members wear red.

[4]Nou drove a four-door, black Honda Accord automobile.

[5]Inside the store, a patron, Fernando Badillo, saw the defendant. Badillo described him as an Asian man between eighteen and twenty-five years of age. The defendant had his hair in a ponytail and wore a blue hat with "Dickies" (the brand name) in white lettering, white sneakers, dark colored pants, and a dark blue sweater. Videotape surveillance, admitted in evidence over objection, shows the defendant inside the store.

[6]Phalla Nou was described as a bald Asian man, about twenty to twenty-five years of age. He was wearing a brown shirt.

[7]San described the defendant as an Asian male who wore a black hat with "Dickies" in white lettering, black clothing, and a blue rag around his neck. San was clear that it was the man with the "Dickies" hat who was the shooter.

[8]San described Yoeun Chhay as an Asian male who wore a blue hat with a "B" on it. Badillo described Chhay as an Asian male in a black shirt who was wearing a hat with the inscription "B" in white.

them. There were, however, two additional witnesses at trial who had observed the events surrounding the shooting. The store clerk, Carlos Urrego,[9] saw two Asian men, both wearing blue, approach the victim's automobile; saw the man on the driver's side, who was wearing a baseball cap and had long black hair, pull out what appeared to be a silver gun from his belt area; heard gunshots; and saw the two men run to an automobile parked behind the victim's. Urrego telephoned 911 and directed Badillo to get the license plate number. Badillo wrote down the license plate number of the black automobile and gave it to Urrego.

Nou testified that he saw the defendant shoot the victim and heard two shots.[10] The shots scared Nou, so he backed up his automobile to get ready to leave, and the defendant and Chhay jumped in. Once inside the automobile, the defendant said, "We got them slobs."[11]

San transported the victim to a nearby hospital. The victim was pronounced dead at 11:16 P.M. He died as a result of a gunshot wound to the left side of his neck that passed through his chest and right lung, and exited his right upper arm area. Police responded to a telephone call from the store at about 11 P.M. A police officer took a piece of paper from Badillo that had what Badillo believed was the license plate number of the black automobile. The officer secured the scene and broadcasted the license plate "over the air."

The central facts concerning the stop of Nou's automobile and subsequent showup identifications were essentially the same as brought out on the suppression motion. Before the stop was made, however, the jury heard that the black automobile had been observed speeding and did not have its headlights on. The .38 caliber semiautomatic handgun recovered from the automobile had one round of ammunition in its chamber and three rounds in its magazine.[12] A discharged cartridge casing

---

[9]Carlos Urrego was later brought to the location of the showup identification procedure, but he did not make any identifications.

[10]Nou testified under a grant of immunity pursuant to G. L. c. 233, § 20E.

[11]The term "slob" is a derogatory term for a Blood gang member.

[12]There was testimony from a firearms identification expert that the firearm had been test fired and was operable.

and a blue bandana also were recovered from the back seat of the automobile. Nou recognized the gun as the same one that the defendant had displayed at the cookout.

Concerning the showup identifications, evidence from the hearing on the defendant's suppression motion of Cardona's identification of the defendant as the shooter changed. At trial, Cardona testified that he had identified Chhay as the shooter. Also, there was evidence that Anderson was not the only witness who identified someone other than the defendant as the shooter.[13] Gaddaffi Henry, who had heard a gunshot when he was inside the store, selected Silent at the showup identification procedure. Henry, however, did not see the shooting. He testified that he heard the gunshot, went to the door after the gunshot, and observed a man with "long hair maybe" and "maybe [wearing] a white shirt" "running away" and getting into a black automobile.

After the showup identifications, Nou spoke with police. He at first "stalled" because he was "nervous and scared," but then told them what had happened. Nou told police that he thought that the automobile driven by the victim was the same one he had seen earlier when someone shot at him and his son. Nou was arrested and charged with accessory after the fact to murder. He pleaded guilty to this charge and was incarcerated and later released on parole. At the time of his trial testimony, Nou was on parole.

Police recovered a discharged cartridge casing on the ground outside the store and a discharged cartridge casing on the ground in front of Nou's home. From a seat inside the automobile the victim had been driving, police found a spent .38 caliber projectile. Testing indicated that the three discharged cartridge casings (from outside the store, from outside Nou's home, and in Nou's automobile) and the projectile recovered from the automobile the victim had been driving all came from the gun found inside Nou's automobile.

b. *The defendant's case.* The defendant did not testify. His trial counsel called two police officers as witnesses to confirm that a surveillance videotape recording from the store grounds had been lost by police. The defense argued that the police lost

---

[13]Douglas Anderson identified Nou as the shooter.

and manipulated evidence, ignored certain identification evidence that the defendant was not the shooter, conducted an "outrageous" showup identification procedure, and conducted an inadequate investigation. Defense counsel also asserted that Nou was a liar and that the absence of gunshot residue on the defendant's hands established that he was not the shooter.

c. *Admission of surveillance tapes.* At trial, there was evidence that there were two security systems operating at the store at the time of the shooting. One system comprised surveillance cameras inside the store that digitally recorded color images. The other system recorded black and white images on a videotape from three camera views. One camera captured the front door of the store looking outside; a second camera, on the left as one faced the store, captured the gasoline pump area outside the store; and a third camera, on the right as one faced the store, captured a pay telephone and an area containing vacuums outside the store. The Commonwealth introduced two videotape recordings (copies of the originals) in evidence, one showing the angle of the front of the store looking outside and the other showing the gasoline pump area. The videotape recording showing the third camera view was lost by police. Because this recording had been lost, defense counsel argued that the defendant was prejudiced because the lost third angle could have been used to cross-examine Badillo.[14] Consequently, the defendant objected to the admission of the videotape recordings depicting the footage from the other two angles. After conducting various voir dire examinations on the matter, the judge declined to exclude the challenged videotape recordings, concluding that the defense had not shown a reasonable probability that the lost recording of the third camera angle would have been exculpatory, and that even if it had been exculpatory, the defendant was not prejudiced by its loss because his trial counsel could cross-examine the Commonwealth's witnesses regarding it and possibly receive the benefit of a missing evidence instruction and instruction concerning inadequate police investigation pursuant to *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980).[15]

---

[14]The area where Badillo asserted that the shooter came from when the shooter went to the victim's automobile would have been in the view of the third camera.

[15]The defendant ultimately did receive the benefit of these instructions.

"A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden . . . to establish a 'reasonable possibility based on concrete evidence rather than a fertile imagination that access to the [evidence] would have produced favorable evidence to his cause.' " *Commonwealth* v. *Cintron*, 438 Mass. 779, 784 (2003), citing *Commonwealth* v. *Olszewski*, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835 (1994), and quoting *Commonwealth* v. *Neal*, 392 Mass. 1, 112 (1984). See *Commonwealth* v. *Williams*, 455 Mass. 706, 718 (2010). If the defendant meets this initial burden, then "the judge, or the court on appeal, must proceed to balance the Commonwealth's culpability, the materiality of the evidence, and the prejudice to the defendant in order to determine whether the defendant is entitled to relief." *Id.* "We will not disturb a judge's decision regarding the proper remedy for the loss of evidence absent a clear abuse of discretion." *Commonwealth* v. *Carr*, 464 Mass. 855, 870 (2013), citing *Commonwealth* v. *Cintron*, *supra*.

The judge did not abuse his discretion. The defendant argues that the lost videotape recording could have been used to impeach Badillo's testimony and was "potentially exculpatory" because not all of the witnesses had identified the defendant as the shooter. The portion of Badillo's testimony cited by the defendant concerns the direction from which the shooter came, not the identification of the defendant as the shooter. Badillo did not waver in his identification of the defendant, the "loud one" from the store, as the shooter. The judge correctly noted that, in light of the other identification evidence implicating the defendant as the shooter,[16] it was "fairly speculative" that the missing tape would have been exculpatory. The defendant's claim is not predicated on the equivalent of "concrete evidence." *Commonwealth* v. *Cintron*, *supra*.

---

[16]There also was testimony from Detective James Latham of the Lowell police department that he reviewed the original videotape recording with all three camera views and isolated the footage from two camera views on separate videotape recordings that he gave to the prosecutor. Detective Latham testified that he had examined the third camera footage, but that he did not record it because there was "nothing of interest" on it. While Detective Latham's credibility was challenged during his cross-examination, defense counsel offered only speculation in claiming that the lost footage would have been exculpatory.

Even if the judge had concluded that the defendant had met his burden, the judge did not abuse his discretion in determining that the defendant was not prejudiced from the loss because "he was able, during cross-examination of the testifying police officers, to exploit the lost evidence by casting doubt on the thoroughness and accuracy of the police investigation," *Commonwealth* v. *Carr, supra* at 871, thereby setting up a *Bowden* defense. *Commonwealth* v. *Bowden, supra.* The defendant also benefited from a missing evidence instruction to highlight the loss of the evidence.

d. *Evidence of bias.* Prior to Badillo's testimony, defense counsel argued that he should be permitted to impeach Badillo with his prior convictions and evidence of bias. At the time of the shooting, Badillo had been charged with mayhem, assault and battery, and assault and battery causing serious bodily injury. Following the shooting, but before trial, Badillo, on May 25, 2007, pleaded guilty to the above-named charges and was placed on probation. Defense counsel asserted that Badillo was biased at the time he spoke with police about the shooting because of the pending charges. In addition, defense counsel argued that Badillo would be biased toward the prosecution during his trial testimony because he was on probation, which is subject to being revoked. The judge conducted a voir dire, at which Badillo testified that, when police questioned him about the shooting on June 13 and 14, 2006, he did not think that cooperating with the police would affect his pending case. The judge ruled that Badillo could only be impeached with his prior convictions, and defense counsel did so. The defendant contends on appeal that the judge's ruling was erroneous and violated several of his State and Federal constitutional rights.

"Cross-examination of a prosecution witness to show the witness's bias or prejudice is a matter of right under the Sixth Amendment to the Constitution of the United States and art. 12 of the Declaration of Rights of the Commonwealth." *Commonwealth* v. *Allison,* 434 Mass. 670, 681 (2001). "If, 'on the facts, there is a possibility of bias, even a remote one, the judge has no discretion to bar *all* inquiry into the subject' " (emphasis added). *Id.*, quoting *Commonwealth* v. *Tam Bui,* 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995). Defendants have a "right

to question . . . witness[es] about . . . pending criminal charges in order to show [a witness's] motive in cooperating with the prosecution." *Commonwealth* v. *Carmona*, 428 Mass. 268, 270 (1998), quoting *Commonwealth* v. *Connor*, 392 Mass. 838, 841 (1984). A defendant similarly may question a witness about the witness's pending status as a probationer. *Davis* v. *Alaska*, 415 U.S. 308, 317-318 (1974). Even if no promises have been made to a witness concerning the pending charges or probation status, "it is enough 'that a prosecution witness is hoping for favorable treatment . . . to justify inquiry concerning bias.' " *Commonwealth* v. *Carmona*, *supra*, quoting *Commonwealth* v. *Henson*, 394 Mass. 584, 587 (1985).

"Determining whether the evidence demonstrates bias . . . falls within the discretion of the trial judge." *Commonwealth* v. *LaVelle*, 414 Mass. 146, 153 (1993). "A judge does have discretion to limit cross-examination concerning possible bias when further questioning would be redundant," *Commonwealth* v. *Tam Bui*, *supra*, "where there has been such 'extensive inquiry' that the bias issue 'has been sufficiently aired,' " *Commonwealth* v. *Avalos*, 454 Mass. 1, 7 (2009), quoting *Commonwealth* v. *LaVelle*, *supra* at 154, or "where the offered evidence is 'too speculative,' " *Commonwealth* v. *Avalos*, *supra*, quoting *Commonwealth* v. *Tam Bui*, *supra* at 402. In addition, when a voir dire hearing establishes that no possibility of bias exists, a judge may prohibit cross-examination on bias. See *Commonwealth* v. *Haywood*, 377 Mass. 755, 763 (1979) (cross-examination on bias not necessary where voir dire established that witness's description of events did not change in favor of Commonwealth after charges arose against him).

In the circumstances of this case, we conclude that the judge did not abuse his discretion in precluding inquiry concerning possible bias. Significantly, the judge did not altogether foreclose inquiry on the issue. Rather, he conducted a voir dire hearing, at which Badillo testified that the pending charges against him and subsequent imposition of probation did not influence his cooperation with police or the prosecutor. There was no showing that Badillo's trial testimony was inconsistent with any prior statements he made, although charges were pending when he initially made statements to the police after the shooting. Also, the jury

were not required to rely on Badillo's testimony to establish the salient facts concerning the shooting. There was other witness testimony, including Nou's testimony, concerning the shooting, the defendant's presence at and involvement in the shooting, and the later showups. The judge allowed impeachment of Badillo with his convictions that pertained to the charges existing when he spoke with police after the shooting and that related to his probation. Defense counsel's claims of bias were grounded only in speculation. There was no error on the record before us.

  e. *Decision not to discharge juror.* The defendant maintains that his State and Federal constitutional rights to an impartial jury were violated because the judge did not discharge a juror who reported that, over the preceding weekend, someone had thrown a rock with a light blue paint mark on it, and had broken the window of her husband's automobile when it was parked at their home. The defendant contends that the juror's notation of the color of the mark demonstrated that she "was already making a connection between the stone and defendant," because of the color associated with the gang to which the defendant belonged (Asian Boyz), and therefore her ability to be fair and impartial "was no longer unequivocally assured."

  If, during trial or jury deliberations, the judge is advised of a claim of an extraneous influence on the jury, he or she is to first "determine whether the material . . . raises a serious question of possible prejudice." *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). If a "a juror indicates exposure to the extraneous material in question, an individual voir dire is required to determine the extent of that exposure and its prejudicial effect." *Commonwealth* v. *Tennison*, 440 Mass. 553, 557 (2003). Because the judge "is in the best position to observe and assess the demeanor of the juror[] on voir dire . . . [t]he determination that [a] juror was unaffected by extraneous information is within the sound discretion of the trial judge." (Citation omitted.) *Id.* at 560.

  When the issue arose, the judge promptly brought it to the attention of counsel and conducted a voir dire examination of the juror before she had contact with any other jurors. During this examination, the juror explained that the incident had occurred over the weekend; the police did not think it was random because

her husband's automobile was parked in their driveway and not on the street; and when she told police that she was serving as a juror, they told her to notify a court officer. The judge inquired further, and the juror stated that the incident would not have an effect on her ability to be fair and impartial and would "absolutely not" influence her verdict. The judge advised her that, if she felt "in the slightest way" that somehow the incident might affect her ability to be a fair juror, then she should notify the court. The juror agreed and indicated that she would not mention the incident to any other jurors. We conclude that the judge handled the situation correctly and did not abuse his discretion in declining to discharge the juror. See *Commonwealth* v. *Rosario*, 460 Mass. 181, 194-195 (2011) (no abuse of discretion in judge's decision not to discharge juror where judge properly conducted individual voir dire of juror and there was no reason to second guess judge's finding of no prejudice). Even if the juror made a connection between the blue marking on the rock and the Asian Boyz gang, she stated explicitly that she was able to be fair and impartial. There was no "solid evidence of a distinct bias." *Commonwealth* v. *Phim*, 462 Mass. 470, 481 (2012), quoting *Commonwealth* v. *Bryant*, 447 Mass. 494, 500 (2006).

f. *Jury instructions.* i. *Showup identification procedure.* During his final charge, the judge instructed the jury as follows:

> "You may also take into account that any identification that was made by picking the defendant out of [a] group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to a witness."

The defendant argues for the first time on appeal that this language was "factually incorrect" because it informed the jury that the showup identification procedure "was the same" as viewing multiple subjects in a photographic array or lineup. He also contends that the instruction amounted to improper vouching by the judge "for the credibility of the identification of the defendant at the showup" and that the instruction "essentially t[old]" the jury to ignore the identifications of Nou and Silent as the shooter. The defendant misreads the instruction that

informed the jury that, to the extent they determined that the individuals in the showup turned around one at a time (instead of all four suspects facing each witness, as the trial testimony differed on this point), such a presentation was *less* reliable than a lineup. The defendant requested this instruction, and it was a correct statement of law to which he was entitled. See *Commonwealth* v. *Cuffie*, 414 Mass. 632, 639-640 (1993). There was no error.

ii. *Requested jury instruction.* At trial, Nou testified that the defendant, whom he knew, had been the shooter. Nou also stated that, in connection with the victim's death, he had been charged with being an accessory after the fact to murder, had pleaded guilty to that charge, and had served his term of incarceration and was on parole. During his cross-examination, Nou stated that he had been given immunity from further prosecution in this case. During his redirect examination, Nou explained that he was testifying because he wanted to "do the right thing," that no one had made him any promises in exchange for testifying, and that he had promised to tell the truth. The judge then instructed the jury as follows:

> "[T]estimony has been offered by this witness who has been granted immunity under [G. L. c. 233, § 20E]. The statute provides in pertinent part that a justice of the Supreme Judicial Court, Appeals Court, or Superior Court shall, at the request of the Attorney General or a District Attorney and after a hearing, issue an order granting immunity to a witness provided that such justice finds that the witness did validly refuse or is likely to refuse to answer questions or produce evidence on the grounds that such testimony or such evidence might tend to incriminate him. A witness who has been granted immunity and who subsequently testifies cannot be prosecuted on account of the matter about which he or she has testified except for perjury or contempt committed while giving his or her testimony. A defendant cannot be convicted solely on the testimony of or the evidence produced by a witness who has been granted immunity under the provisions of [G. L. c. 233, § 20E]. Rather, the law requires that in order for a conviction to result in a case where immunized testimony is offered there must be some evidence from another

source that supports the testimony of the immunized witness on at least one element of proof essential to convict the defendant."

The defendant argues that the judge erred in declining to give his requested jury instruction regarding the "particular care" the jury should use in examining Nou's immunized testimony and thus violated the central purpose of *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989), to correct improper vouching inherent in communicating to a jury that a cooperating witness has received immunity. Because the defendant objected to the judge's decision not to give his requested instruction, we review for prejudicial error. See *Commonwealth* v. *Williams*, 439 Mass. 678, 682 (2003).

"Testimony offered by a witness in exchange for the government's promise of a plea bargain or immunity should be treated with caution, lest the jury believe that the government has special knowledge of the veracity of the witness's testimony." *Commonwealth* v. *Marrero*, 436 Mass. 488, 500 (2002). "The danger increases when the jury are informed that the validity of the agreement depends on the truthful nature of the testimony." *Id.* "If properly handled, however, such an agreement does not constitute improper prosecutorial vouching for the witness." *Id.* "In the *Ciampa* decision, this court set forth guidelines to be used when a witness testifies pursuant to a plea or immunity agreement that explicitly incorporates a witness's promise to testify truthfully, to minimize the possibility that the jury will believe the witness because the Commonwealth, in effect, has guaranteed the truth of the witness's testimony." *Id.*, citing *Commonwealth* v. *Ciampa*, *supra* at 264-266.

In *Commonwealth* v. *Washington*, 459 Mass. 32, 44 n.21 (2011), we explained:

> "Where a *Ciampa* instruction is warranted, the following rules apply. A prosecutor may generally bring out on direct examination the fact that a witness has entered into a plea agreement and understands his obligations under it, but any attempts to bolster the witness by questions concerning his obligation to tell the truth should await redirect examination, and are appropriate only after the defendant

has attempted to impeach the witness's credibility by showing the witness struck a deal with the prosecution to obtain favorable treatment. *Commonwealth* v. *Ciampa*, 406 Mass. 257, 264 (1989). A prosecutor in closing argument may then restate the witness's agreement, but commits reversible error if she 'suggests that the government has special knowledge by which it can verify the witness's testimony.' *Id.* at 265. To guard against an implied representation of credibility, the judge must 'specifically and forcefully tell the jury to study the witness's credibility with particular care.' *Id.* at 266, citing *United States* v. *Mealy*, 851 F.2d 890, 900 (7th Cir. 1988). Where the jury are aware of the witness's promise to tell the truth, the judge also should warn the jury that the government does not know whether the witness is telling the truth. . . ."

Here, where Nou was granted immunity and where the prosecutor on redirect examination elicited that Nou had promised to tell the truth, we agree with the defendant that the *Ciampa* instruction should have been given. However, having considered the weight of the evidence and the judge's instructions to the jury to consider whether any witness "ha[d] a motive for testifying in a certain way, displayed a bias, or ha[d] [an] interest in the outcome of the case," we can say "with fair assurance . . . that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

g. *Review pursuant to G. L. c. 278, § 33E.* We have examined the record and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E, to set aside or reduce the verdict of murder in the first degree.

4. *Conclusion.* We affirm the order denying the defendant's motion to suppress identification evidence and affirm his convictions.

*So ordered.*